## AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, LOCAL 2119, et al., Plaintiffs–Appellants,

v.

## William S. COHEN, et al., Defendants–Appellees.

No. 98–1504.

United States Court of Appeals, Seventh Circuit.

Argued Nov. 30, 1998.

Decided March 18, 1999.

---

their union now appeal that decision. While we agree with the district court that the plaintiffs do not have standing to challenge violations of the procurement and contracting statutes (10 U.S.C. § 2462 and 10 U.S.C. § 2304), we believe they have met the standing requirements with respect to the Arsenal Act, and may pursue their claim that it has been violated. We therefore reverse in part and remand.

Mark D. Roth (Michael J. Schrier, Staff Counsel, on the briefs), American Federation of Government Employees, Washington, DC, David Cunningham, Winstein, Kavensky & Wallace, Rock Island, IL, Kevin M. Grile (argued), American Federation of Government Employees, Chicago, IL, for Plaintiffs–Appellants.

Anthony J. Steinmeyer (argued), William Kanter, Department of Justice, Civil Division, Appellate Section, Washington, DC, for Defendants–Appellees.

Before FLAUM, KANNE, and EVANS, Circuit Judges.

FLAUM, Circuit Judge.

Federal employees at a government owned arsenal and their union sued the Department of the Army ("Army") over its decisions to award two defense projects to private contractors. The employees claimed that the Army failed to comply with certain procurement and contracting statutes as well as the Arsenal Act, codified at 10 U.S.C. § 4532. Had the Army complied with these statutes, the plaintiffs maintained, the projects would have been performed at their government facility, thereby preserving federal job opportunities. The district court held that because employment interests were not within the "zone-of-interests" protected by the statutes at issue, the plaintiffs had failed to establish standing. The employees and

## Background

Local 2119 of the American Federation of Government Employees ("AFGE") represents the civilian employees of the Rock Island Arsenal ("Rock Island"), one of the only remaining arsenals owned and operated by the U.S. Government. Rock Island produces half of the gun mounts for the Army's M1A2 Abrams Tank program ("M1A2"). Until recently, the other half was supplied by the Detroit Arsenal Tank Plant ("Detroit Arsenal"), a government owned facility operated by General Dynamics Land Systems ("General Dynamics"), a private defense contractor.

In 1995, pursuant to the Defense Base Realignment and Closure Act of 1990, 10 U.S.C. § 1687 ("BRAC"), Congress closed the Detroit Arsenal. Instead of transferring the excess tank mount work to Rock Island, the Army allowed General Dynamics to continue producing the mounts at a private facility. In 1996, the Army sought bids for the production for a new ultra-light howitzer, known as the VIPER. After canvassing its own facilities and finding no interest in producing the new weapon,[1] the Army decided to bid the project only to private contractors. Rock Island, which had developed a prototype VIPER, attempted to bid on the project through Lewis Machine & Tool Company ("Lewis"), a private contractor. Because the competition was open only to the private sector, the Army rejected Lewis' bid when

---

1. The extent of this canvassing and whether Rock Island ever failed to show an interest in the VIPER are disputed by the parties. Although this question may be important on the merits, because we do not consider it vital to our standing analysis, we need not address it here.

Rock Island's participation in it was discovered.

Following these events, the Army ordered Rock Island to undertake certain layoffs. Before this reduction in force ("RIF") took effect on September 25, 1998, however, the AFGE and some of its members filed suit in federal court pursuant to the Administrative Procedure Act ("APA"). 5 U.S.C. § 702.[2]

Although the plaintiffs did not directly challenge the RIF, they claimed that the Army failed to comply with relevant statutes in its decisions not to transfer the M1A2 tank mount work from the Detroit Arsenal to Rock Island and to bar Rock Island from bidding on the VIPER project. The first statute, known as the Arsenal Act, provides that Army supplies shall be "made in arsenals or factories owned by the United States" if it can be done "on an economical basis." 10 U.S.C. § 4532. According to the plaintiffs, this provision requires a cost analysis comparing in-house and private production costs before the Army can award work to a private contractor. The plaintiffs claim the Army failed to make this comparison prior to allowing General Dynamics to retain its portion of the M1A2 work and before deciding to limit bidding on the VIPER program to non-government entities. The plaintiffs also claimed that 10 U.S.C. § 2462, referred to by the parties as the "private procurement statute," mandates a similar cost comparison which the Army allegedly never undertook. That statute requires the Secretary of Defense to procure supplies and services from "a source in the private sector if such a source can provide [them] at a cost that is lower ... than the cost at which the [government] can provide [them]." 10 U.S.C. § 2462. Finally, the plaintiffs asserted that the Army violated 10 U.S.C. § 2304, known as the Competition in Contracting Act. That statute directs the heads of federal agencies contemplating the procurement of supplies or services to "obtain full and open competition through the use of competitive procedures ..." 10 U.S.C. § 2304(a)(1)(A). This, claimed the plaintiffs, necessarily implies that both the M1A2 and the VIPER work should have been bid to all qualified candidates including Rock Island.

The Army's failure to comply with any of these statutes, argued the plaintiffs, contributed to Rock Island's dwindling work load and led directly to the RIF. This in turn has caused, or threatens to cause, severe harm to the arsenal's employees through job loss, demotions, lower average pay, and fewer opportunities for advancement.

The government moved to dismiss the suit under Rule 12(b)(1) of the Federal Rules of Civil Procedure, for lack of standing to enforce the statutes at issue. After reviewing these provisions, the court determined that, together, they merely detailed "procedures for minimizing contract costs and ensuring that the government resources are put to efficient use when contracting for goods or downsizing." The court concluded that because "the purpose of these statutes is not to protect the tenure and working conditions of workers employed at government installations," the plaintiffs' interests were not within the "zone-of-interests" protected by the statutes and they therefore lacked standing. The court also suggested that to the extent the federal workers were attempting to enforce the rights of their employer, Rock Island, their alleged injuries were only derivative, and not sufficient to support standing. *See J.F. Shea Co. v. City of Chicago*, 992 F.2d 745 (7th Cir.1993). The court therefore granted the government's motion.

The plaintiffs now appeal, claiming that the court applied the zone-of-interest test too narrowly, particularly in light of the

---

2. This section of the APA provides in part: "A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof...." 5 U.S.C. § 702.

Supreme Court's subsequent statement of that test in *National Credit Union Admin. v. First Nat'l Bank & Trust,* 522 U.S. 479, 118 S.Ct. 927, 140 L.Ed.2d 1 (1998) ("*NCUA*").

## Discussion

 We review de novo an order dismissing for lack of standing, *see Family & Children's Center v. School City of Mishawaka,* 13 F.3d 1052, 1057–58 (7th Cir. 1994), accepting as true all material allegations of the complaint and construing the complaint in favor of the complaining party. *Warth v. Seldin,* 422 U.S. 490, 501, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975); *see also Lujan v. National Wildlife Federation,* 497 U.S. 871, 889, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990) (on a motion to dismiss, the court presumes that general factual allegations embrace those specific facts necessary to support the claim). In deciding on a motion to dismiss, this court considers whether relief would be possible under any set of facts that could be established consistent with the allegations in the complaint. *Venture Associates Corp. v. Zenith Data Systems,* 987 F.2d 429, 432 (7th Cir.1993). Obviously, if a plaintiff cannot establish standing to sue, relief from this court is not possible, and dismissal under 12(b)(1) is the appropriate disposition. *Id.*

 Those seeking judicial review of administrative actions under the APA must show that they have been "adversely affected or aggrieved by agency action within the meaning of the relevant statute." 5 U.S.C. § 702. That entails the establishment of two standing requirements: an injury-in-fact and an interest falling within the "zone-of-interests" protected by the relevant statutes. *Association of Data Processing Service Organizations v. Camp,* 397 U.S. 150, 153, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970) ("*Data Pro-*

*cessing*"). The first requirement is constitutional while the second is considered prudential.[3] Although the district court's dismissal relied solely on prudential grounds obviating the need to inquire into injury-in-fact, *see National Federation of Federal Employees v. Cheney,* 883 F.2d 1038, 1041 n. 8 ("*NFFE*"), because the constitutional limitation goes directly to this court's jurisdiction, we are free to examine it at any time. *See Steel Co. v. Citizens for a Better Tomorrow,* 523 U.S. 83, 118 S.Ct. 1003, 1016, 140 L.Ed.2d 210 (1998). The Army raises constitutional and prudential objections to the plaintiffs' standing, so we will examine both.

 Initially, however, the Army separately challenges the standing of AFGE as a representative of the individual plaintiffs. Representational standing is appropriate where: a) an association's members would otherwise have standing to sue in their own right; b) the interests it seeks to protect are germane to the organization's purpose; and c) the participation of individual members is not required in the lawsuit. *International Union of United Auto. Workers v. Brock,* 477 U.S. 274, 282, 106 S.Ct. 2523, 91 L.Ed.2d 228 (1986). The second and third requirements are met here because employee job benefits are obviously germane to the union's purpose and because the plaintiffs seek injunctive relief, individual participation by union members is not required. The standing of AFGE in its representational capacity therefore depends on whether its individual members would have standing in their own right. It is to this question we turn next.

### Constitutional Standing Requirements

 Article III of the U.S. Constitution confines courts to the adjudication of "cases or controversies." *Allen v. Wright,* 468 U.S. 737, 750, 104 S.Ct. 3315,

---

**3.** The difference between constitutional and prudential standing requirements is that the latter are court-imposed (in the interest of judicial self-restraint) while the former is an absolute limit on the court's jurisdiction imposed by the Constitution itself. *See Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992).

82 L.Ed.2d 556 (1984). For challenges to agency action, this has come to mean that potential plaintiffs must show that they have suffered an "injury-in-fact". *Data Processing*, 397 U.S. at 153, 90 S.Ct. 827. Injury-in-fact, in turn, contains three components. First, the injury must be concrete, particularized, and actual or imminent (instead of conjectural or hypothetical). *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). Next, the injury must be sufficiently traceable to the defendant's challenged action so that the action may fairly be said to bear a causal connection to the injury. *Id.* Finally the plaintiffs must show that it is likely, rather than merely possible, that a favorable decision by the court would redress the injury. *Id.* at 561, 112 S.Ct. 2130; *Citizens for a Better Environment*, 118 S.Ct. at 1016. We believe the plaintiffs have met all three of these injury-in-fact requirements.

Before the district court, the plaintiffs claimed that the RIF at Rock Island would result in terminations or lost job benefits. The RIF has now gone into effect and although none of the individual plaintiffs in this suit has been terminated, all claim to have been demoted to less skilled, and lower paying positions. This not only means lower income and a drop in retirement benefits (which are calculated based on "average pay", 5 U.S.C. §§ 8339, 8415), but also the loss of job fulfillment or prestige associated with higher skilled work. This actual loss or diminishment of employment benefits, as well as the non-economic detriments, are a sufficiently concrete and particularized injury for constitutional purpose. *See Bowsher v. Synar*, 478 U.S. 714, 721, 106 S.Ct. 3181, 92 L.Ed.2d 583 (1986) (failure to receive future increase in benefits is

sufficient to confer Article III standing); see also *United States v. Students Challenging Regulatory Agency Procedures*, 412 U.S. 669, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973) (aesthetic, environmental and recreational injury); *Trafficante v. Metropolitan Life Ins. Co.*, 409 U.S. 205, 93 S.Ct. 364, 34 L.Ed.2d 415 (1972) (loss of social benefits of integrated community as injury).

Next, the plaintiffs can reasonably trace these reduced job benefits to the Army's procurement and contracting procedures. Specifically, they claim that Rock Island's commanding officer, Colonel Steven L. Roop admitted that "lack of workload" was the only reason for the RIF. The plaintiffs have also cited the statement of the Army's General Counsel, Anthony Gamboa, who said that "under the Arsenal Act analysis 100% of [the] tank gun mounts should be manufactured at Rock Island." Additionally, based on its work on the prototype, the plaintiffs allege that Rock Island's projected unit cost for the production of the VIPER program was significantly lower than that of the private contractor which was ultimately awarded the work. Thus, assuming as we must at this stage that these allegations are true, had the statutory cost comparisons been performed before allowing General Dynamics to retain its share of the M1A2 work, and before Rock Island was kept from participating in the VIPER bidding,[4] Rock Island would likely have maintained sufficient work load to avoid the RIF entirely, or at least reduce its severity.[5]

The third requirement, that the alleged injury be redressed by a favorable decision, is also satisfied. The plaintiffs are seeking injunctive relief in the form of retroactive application of the statutorily required cost comparisons and bidding re-

---

4. Whether the provisions the plaintiffs cite actually do require the cost comparisons or bidding participation the plaintiffs seek is a question for the merits. At this stage it is enough to inquire whether such requirements would redress their injuries.

5. The plaintiffs allege that the VIPER program alone created 225 new jobs for the private contractor awarded the work, nearly the same number effected by the RIF at Rock Island.

quirements to determine whether either of the challenged work loads should be carried out at Rock Island. Again, assuming the allegations above are true, Rock Island stands a good chance of gaining some of this work. *Cf. National Maritime Union of America v. Commander, Military Sealift Command,* 824 F.2d 1228, 1236 (D.C.Cir.1987) (redressability requirement not met where record did not even suggest that employer of union members would participate in re-bid after union challenged bidding process). If that happens, the RIF and its impact may be avoided.[6] We recognize that this is only a probability, but probabilities are enough to satisfy Article III's requirements. *North Shore Gas Co. v. EPA,* 930 F.2d 1239, 1242 (7th Cir. 1991) (citing *Air Courier Conference of America v. American Postal Workers Union,* 498 U.S. 517, 524, 111 S.Ct. 913, 112 L.Ed.2d 1125 (1991)).[7]

The government's argument that constitutional standing requirements have not been satisfied is unavailing. Citing this court's decision in *J.F. Shea v. City of Chicago,* 992 F.2d 745 (7th Cir.1993), the government suggests that the plaintiffs have failed to establish any injury-in-fact because their claims are merely derivative of the harm suffered by their employer, Rock Island. In *J.F. Shea* we held that an employee did not have standing to challenge on constitutional grounds a construction contract awarded to his employer's competitor under a local business preference rule. *Id.* at 748. Despite claiming that the award threatened his job prospects, we held that the employee had not alleged a cognizable injury distinct from his employer's. *Id.* at 748. This bootstrapped claim was not allowed because it

amounted to the plaintiff "resting his claim to relief on the legal rights or interests of [a] third party." *Id.* (citing *Warth v. Seldin,* 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975)). In denying standing, we observed that "because employees must allege a separately cognizable injury, employees generally do not have standing to assert claims of the corporation...." *J.F. Shea,* 992 F.2d at 749. From this, the government concludes that the plaintiffs cannot establish injury-in-fact because they are really asserting the claims of Rock Island.

■ This conclusion, however, misconstrues the standing discussion in *J.F. Shea.* The concern in that case was not constitutional but prudential. 992 F.2d at 749; *Warth,* 422 U.S. at 499, 95 S.Ct. 2197 ("[e]ven when the plaintiff has alleged injury sufficient to meet the 'case or controversy' requirement, this Court has held that the plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties"). Whether a plaintiff suffering injury-in-fact is properly asserting his own rights, or improperly asserting those of another, is a prudential question. *Warth,* 422 U.S. at 500, 95 S.Ct. 2197 (standing concerns beyond the Article III minimum are "essentially matters of judicial self-governance"). The plaintiff in *J.F. Shea* was denied standing not because he failed to allege a constitutionally sufficient injury, but because he was asserting rights which were not (even arguably) his own. 992 F.2d at 749. Whether the plaintiffs in this case are asserting their own rights and interests is dealt with below.

---

6. Even if the RIF were still necessary, all of the plaintiffs may have avoided being targets of it because they claim to have worked on either the M1A2 or VIPER projects.

7. We note that this case is distinguishable from those holding that redressability is not satisfied if relief depends on the voluntary actions of a third party not joined in the suit. *See Burton v. Central Interstate Low–Level Ra-*

*dioactive Waste Compact Comm'n,* 23 F.3d 208, 209–10 (8th Cir.1994). The plaintiffs are claiming that the Arsenal Act, had it been complied with, would mandate the production of both the entire M1A2 and VIPER work at Rock Island, making the RIF impossible. Whether this is true is a question for the merits, but the allegation is enough for standing purposes.

But as discussed above, they have alleged sufficient injury-in-fact.[8]

That Rock Island can also claim injury-in-fact, and may have been a proper plaintiff, does not itself strip the employees of standing. This is implicit in those cases allowing federal employee unions to challenge military base closures. *See National Federation of Federal Employees v. United States*, 905 F.2d 400, 402 (D.C.Cir. 1990); *but see Mid–State Fertilizer v. Exchange Nat. Bank*, 877 F.2d 1333, 1335 (7th Cir.1989) (stockholders and corporation could not both sue on same claim where double recovery was possible). As the Supreme Court recently re-affirmed, "it is self-evident that more than one party may have standing to challenge a particular action or inaction. Once it is determined that a particular plaintiff is harmed by the defendant, and that the harm will likely be redressed by a favorable decision, the plaintiff has standing—regardless of whether there are others who also have standing to sue." *Clinton v. City of New York*, 524 U.S. 417, 118 S.Ct. 2091, 2099 n. 15, 141 L.Ed.2d 393 (1998). Thus, because the plaintiffs have alleged a concrete injury to themselves, traceable to the challenged action and capable of redress by a favorable decision, they have met the injury-in-fact requirement.

### Prudential Standing Requirements

■ For plaintiffs challenging agency actions under the APA, the Supreme Court has imposed a prudential standing requirement on top of that mandated by Article III. Referred to as the "zone-of-interest" test, this limitation asks a potential plaintiff to "establish that the injury he complains of (his aggrievement, or the adverse effect upon him) falls within the 'zone-of-interests' sought to be protected by the statutory provision whose violation forms the legal basis for his complaint." *Lujan v. National Wildlife Federation*, 497 U.S. 871, 883, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990). This prudential inquiry is "founded in concern about the proper—and properly limited—role of the courts in a democratic society." *Warth*, 422 U.S. at 498, 95 S.Ct. 2197. Because injury-in-fact is an elastic concept, capable of encompassing nearly all who are effected in some way by an agency action, *see Lujan*, 497 U.S. at 883, 110 S.Ct. 3177; *see also* Cass Sunstein, *Standing Injuries*, 1993 S.Ct. Rev. 37 (1993), a further limitation on access to a judicial forum—the zone-of-interests test—was deemed appropriate. *Data Processing*, 397 U.S. 150, 157, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970).[9]

Exactly what this limitation entails has been less than self-evident. *See National Credit Union Admin. v. First Nat'l Bank & Trust*, 522 U.S. 479, 118 S.Ct. 927, 932, 140 L.Ed.2d 1 (1998) ("*NCUA*") ("[O]ur prior cases have not stated a clear rule for determining when a plaintiff's interest is 'arguably within the zone-of-interests' to be protected by a statute."). As a result, since being announced in *Data Processing* nearly thirty years ago, the zone-of-interest test has proved deceptively difficult to apply, and, for that reason, has not been without its critics. *See Peoples Gas, Light*

---

8. Part of the government's confusion undoubtably stems from our use of the phrase "cognizable injury" in *J.F. Shea. See* 992 F.2d at 749. Cognizable injury means an injury to a recognized right or interest, but does not necessarily refer to injury-in-fact. *See Data Processing*, 397 U.S. 150, 153, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970).

9. In *Lujan*, the Court gave the following illustration of how injury-in-fact alone does not necessarily justify standing under the APA:
The failure of an agency to comply with a statutory provision requiring "on the record" hearings would assuredly have an adverse effect [i.e. injury-in-fact] upon the company that has the contract to record and transcribe the agency's proceedings; but since the provision was obviously enacted to protect the interests of the parties to the proceedings and not those of the reporters, that company would not be "adversely affected within the meaning . . . of the relevant statute."
497 U.S. at 883, 110 S.Ct. 3177 (quoting 5 U.S.C. § 702).

& Coke v. United States Postal Service, 658 F.2d 1182, 1195 (7th Cir.1981); *See also* K. Davis, Administrative Law Treatise 24:17 (2nd ed.1983).

 The most complete statement of the test is found in *Clarke v. Securities Indus. Ass'n,* 479 U.S. 388, 399–400, 107 S.Ct. 750, 93 L.Ed.2d 757 (1987). There the Court explained:

> The "zone of interest" test is a guide for deciding whether, in view of Congress' evident intent to make agency action presumptively reviewable, a particular plaintiff should be heard to complain of a particular agency action. In cases where the plaintiff is not itself the subject of the contested regulatory action, the test denies a right of review if the plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit. The test is not meant to be particularly demanding; in particular, there need be no indication of congressional purpose to benefit the would-be plaintiff.

*Id.* Although "[g]eneralizations about standing to sue are largely worthless as such" (*Data Processing,* 397 U.S. at 151, 90 S.Ct. 827)—particularly given the statute-specific nature of the zone-of-interest inquiry—the Court's description in *Clarke,* as well as its recent re-affirmation of that description in *NCUA,* 118 S.Ct. at 934, do provide some clues. First, intended beneficiaries of statutory provisions have standing to enforce them. Theirs are obviously the very interests the statute seeks to

**10.** This does not, however, mean that those who are more than incidentally benefitted by the statute's provisions necessarily pass the zone test. *See TAP Pharmaceuticals v. U.S. Dept. of Health and Human Services,* 163 F.3d 199 (4th Cir.1998).

**11.** A fourth clue, and perhaps the only generalization that can safely be made, is that commercial competitors of regulated firms seeking to enforce those regulations invariably pass the zone-of-interest test. *See NCUA,* 522 U.S. 479, 118 S.Ct. 927, 140 L.Ed.2d 1;

protect. *See Clarke,* 479 U.S. at 400, 107 S.Ct. 750. Next, however, the test does not require that Congress have specifically intended to benefit a particular class of plaintiffs before any member of that class has standing. *See NCUA,* 118 S.Ct. at 927. It is enough that there be an "unmistakable link" between a statute's purpose and the interests advanced by the plaintiff. *Id.* at 936 n. 7. When such a link exists, it can safely be inferred that those interests are within the zone protected by the statute. *Id.* Third, plaintiffs who are only incidentally benefitted, or whose interests are inconsistent with the statute's purposes, do not pass the test, for it cannot reasonably be inferred that Congress intended their suits despite the presumption in favor of reviewability.[10] *See Lujan,* 497 U.S. at 883, 110 S.Ct. 3177.[11] Finally, the Court has suggested a general approach to applying the test: "[W]e first discern the interests 'arguably ... to be protected' by the statutory provision at issue; we then inquire whether the plaintiff's interests affected by the agency action in question are among them." *NCUA,* 118 S.Ct. at 935.

With these clues and the general approach to guide us, we examine whether the plaintiffs' interests fall within the zones-of-interest of any of the relevant statutes they cite.

### 10 U.S.C. § 2462

 The first statute plaintiffs rely on is 10 U.S.C. § 2462. Referred to by the parties as the "private procurement statute," it provides in relevant part:

> *Clarke,* 479 U.S. at 403, 107 S.Ct. 750; *Investment Company Inst. v. Camp,* 401 U.S. 617, 621, 91 S.Ct. 1091, 28 L.Ed.2d 367 (1971); *Arnold Tours, Inc. v. Camp,* 400 U.S. 45, 46, 91 S.Ct. 158, 27 L.Ed.2d 179 (1970); *Data Processing,* 397 U.S. at 157, 90 S.Ct. 827. Although this is not directly relevant to the plaintiff's claim, it is a way (perhaps the only way) of reconciling the vast majority of Supreme Court zone-of-interest holdings. *See TAP Pharmaceuticals,* 163 F.3d at 207.

(a) In general.—Except as otherwise provided by law, the Secretary of Defense shall procure each supply or service necessary for or beneficial to the accomplishment of the authorized functions of the Department of Defense (other than functions which the Secretary of Defense determines must be performed by military or Government personnel) from a source in the private sector if such a source can provide such supplies or services to the Department at a cost that is lower ... than the cost at which the Department can provide the same supply or service.

(b) Realistic and fair cost comparisons.—For the purpose of determining whether to contract with a source in the private sector ... the Secretary of Defense shall ensure that all costs considered ... are fair and realistic.

*Id.* After reviewing this language, its legislative history and the federal case law interpreting it, the district court concluded that the goal of this statute was to obtain "the optimal level of outsourcing" of military supplies or services provided that the cost comparisons were "fair and reasonable." *Id.* In a case involving a similar challenge under the same statute, the D.C. Circuit concluded that "the legislative history shows that the provision ... was designed to protect the integrity of the contracting out process by resolving 'handicaps' against [private] contractors— the apparent intended beneficiaries of the [the statute]." *National Federation of Federal Employees v. Cheney,* 883 F.2d 1038, 1050 (D.C.Cir.1989) ("*NFFE*"). This conclusion is supported by the only piece of legislative history cited by either party. According to the Senate Report, the provision, originally enacted as part of the National Defense Authorization Act of 1987, was meant to "enable private industry to compete with the government sector whenever possible ...." S.Rep. No. 99–331, 99th Cong., 2d Sess. 278 (1986), 1986 U.S.C.C.A.N. 6413. Although the plaintiffs admit that the interests protected by the statute are primarily those of private contractors, they argue that the statute also guards the public's interest in a "realistic and fair" contracting process.

The question then becomes whether the plaintiffs' interests fall within those protected by the statute. While the plaintiffs concede that they are not its intended beneficiaries, and the statute does not protect government employment opportunities, they nonetheless maintain that they are "suitable challengers" because of their interest in a realistic and fair contracting process. *See Mova Pharmaceuticals v. Shalala,* 140 F.3d 1060, 1075 (D.C.Cir. 1998). In support of this proposition, the plaintiffs cite language from other sections of the National Defense Authorization Act which refers to "employees" in its discussion of the required cost comparison. *See* 10 U.S.C. § 2463(a) and (b). From this, they assert, it can "reasonably be assumed that Congress intended to permit the suit." *Clarke,* 479 U.S. at 399–400, 107 S.Ct. 750.

We are not convinced by this argument. The statutory provision cited by the plaintiffs does not indicate federal employees are particularly reliable challengers. The language only refers to the method of cost comparison contemplated by the statute. Yet the plaintiffs have emphasized that they are not challenging the way cost comparisons should be conducted, only the fact that the government failed to perform one before contracting out the two projects at issue. The D.C. Circuit dealt with this situation in *NFFE,* 883 F.2d at 1051. In that case, a federal employee union challenged the Army's decision to out-source certain defense-related services to private contractors. The union claimed that its members were within the zone-of-interests of 10 U.S.C. § 2462 because they had an interest not only in their jobs, but also in the "lawful and economic conduct of the contracting-out process." *Id.* The court rejected the argument, concluding the members' interest in lawful contracting itself was indistinguishable from that of any taxpayer, which is insufficient to support

standing under the zone-of-interest test. *Id.* at 1047 (citing *Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 94 S.Ct. 2925, 41 L.Ed.2d 706 (1974); *United States v. Richardson*, 418 U.S. 166, 94 S.Ct. 2940, 41 L.Ed.2d 678 (1974)). The circuit court explained:

> If any person or organization interested in promoting [the] protection of the rights created by a statute ... has an interest that falls within the zone protected or regulated by the statute ..., then the zone-of-interest test is not a test because it excludes nothing. Indeed such a reading would mean that this court ignores the Supreme Court's decisions that persons who have only a "generalized grievance" about the way in which government operates do not have standing.

*Id.* (citing *Haitian Refugee Center v. Gracey*, 809 F.2d 794, 812 (D.C.Cir.1987) (internal citations omitted)). Thus, without something more, the federal employees in this case do not pass the test.[12]

The "something more" the plaintiffs claim is the interest in their jobs. This too, however, is not sufficient to satisfy the zone test. Again, the D.C. Circuit rejected the argument that employment was an interest within the zone protected by 10 U.S.C. § 2462:

> Insofar as the appellants assert an interest different from the citizenry-at-large, that interest—the protection of government employees whose job opportunities would be impaired because of contracting out—is close to the very bureaucrat-

ic interest, in expansion of government, that Congress sought to restrain in all of these statutes.

*NFFE*, 883 F.2d at 1051. We agree, as the district court did, that the interests of federal employment, and the goal of private procurement are inconsistent. *Id.* at 1051 ("the interests of the in-house federal employees are therefore 'antithetical' to the interests of private contractors"); *see also American Federation of Government Employees v. Dunn*, 561 F.2d 1310, 1313 (9th Cir.1977) (federal employees lack standing to contest a contracting out of an Air Force food service facility). Interests inconsistent with those clearly protected by a statute do not fall within its zone-of-interests. *See NCUA*, 118 S.Ct. at 934 ("the 'zone-of-interests' test 'denies a right of review if the plaintiff's interests are ... marginally related to or inconsistent with the purposes implicit in the statute") (citing *Clarke*, 479 U.S. at 399, 107 S.Ct. 750).[13]

### 10 U.S.C. § 2304

■■■ The plaintiffs next argue that their interests fall within those protected by the Competition in Contracting Act. 10 U.S.C. § 2304. The act provides in part:

> (a)(1)(A) [The head of an agency contemplating procurement] shall obtain full and open competition through the use of competitive procedures in accordance with the requirements of this chapter and the Federal Acquisition Regulations.

**12.** Although the plaintiffs do not pursue this point, it is worth noting that the absence of other potential plaintiffs does not argue in favor of standing here. *See NFFE*, 883 F.2d at 1038. As the Supreme Court has stated: "The assumption that if respondents have no standing to sue, no one would have standing is not a reason to find standing ... our system of government leaves many crucial decisions to the political process." *Schlesinger*, 418 U.S. at 227, 94 S.Ct. 2925.

**13.** The plaintiffs' reliance on *National Weather Service Employees Organization v. Brown*,

18 F.3d 986, 989 (2nd Cir.1994), is misplaced. In that case, a union representing federal employees had standing to challenge the National Weather Service's decision to relocate two weather forecasting stations out of New York and Boston. *Id.* Unlike the present case, however, the court there found that the Weather Service Modernization Act, the provision the plaintiffs had sued to enforce, specifically identified union interests as among those it was meant to protect. *Id.* The plaintiffs have identified no similar interests protected by 10 U.S.C. § 2462.

10 U.S.C. § 2304(a)(1)(A). "[F]ull and open competition", claims the plaintiffs, means that "all responsible sources are permitted to submit sealed bids" on government projects. 10 U.S.C. § 2302(3)(D). The plaintiffs further claim that the definition of "responsible sources" is broad enough to include government arsenals. *See* 10 U.S.C. § 2302(3)(E). Thus, when the Army contracted out both the M1A2 and VIPER programs without first soliciting bids from Rock Island, it violated this statute.

The plaintiffs concede that 10 U.S.C. § 2304 was meant to save money, curb cost growth, promote innovation and the development of high quality technology and to maintain "the integrity of the expenditure of public funds." S.Rep. No. 98–50, 98th Cong. 2d Sess., at 2–4, 1984 U.S.C.C.A.N. 697, 2174, 2175. Thus, while they admit that their interest in employment may not be within the zone protected by the statute, they nonetheless claim an interest in Rock Island being able to compete for these programs and in seeing that proper procedures are followed.

As discussed above, the federal employees' general interest in proper procedures does not distinguish them from the public at large, and it is not sufficient by itself to satisfy the zone test. *See NFFE,* 883 F.2d at 1051. Their interest in Rock Island's ability to bid on certain projects is also not sufficient to confer standing. It may be true that one of the statute's protected interests is fair access to bidding on government work and Rock Island may well be a "responsible source." Yet as the district court correctly observed, this kind of derivative interest is not sufficient to confer standing. *See J.F. Shea Co. v. City of Chicago,* 992 F.2d 745 (7th Cir.1993). Unlike in our analysis of injury-in-fact, here we must focus on the actual interests the plaintiffs are advancing and compare them with the challenged statute's underlying purpose. The interests must be the plaintiff's own and not those of a third party. *Id.* at 749. However, the federal employees are essentially advancing the interests of their employer, Rock Island. This is the same position in which the employee in *Shea* found himself when objecting to the denial of his employer's right to fair access to the bidding process. *See id.* Thus while Rock Island's interests would clearly be within the zone-of-interests protected by 10 U.S.C. § 2304, its employees' interests are not.

This is the conclusion the Supreme Court reached in *Air Courier Conference v. American Postal Workers,* 498 U.S. 517, 528 n. 5, 111 S.Ct. 913, 112 L.Ed.2d 1125 (1991). In that case, the postal workers union challenged a regulation suspending the Postal Service's statutory monopoly over certain international operations. The workers' interest, according to the Court, was in maximizing their employment opportunities. The postal monopoly, on the other hand, was meant to increase revenues of the Post Office and to ensure that services were provided in a manner consistent with the public's interest. *Air Courier,* 498 U.S. at 526–27, 111 S.Ct. 913. In describing its holding in *Air Courier,* the Court recently stated:

> Only those interests [revenue protection and adequate service], therefore, and not the interests of Postal Service employees in their employment, were "arguably within the zone-of-interests to be protected" by the statute. We further noted that although the statute in question regulated competition, the interests of the plaintiff employees had nothing to do with competition. *Air Courier,* 498 U.S. at 528 n. 5, 111 S.Ct. 913.

*NCUA,* 118 S.Ct. at 938; *see also National Maritime Union of America v. Commander, Military Sealift Command,* 824 F.2d 1228, 1238 (D.C.Cir.1987) (in rejecting disappointed bidder standing to union, court concluded "the right is the [contractor's], not the [employees']"). The plaintiffs in this case have similarly failed to show how any of their interests, as opposed to the interests of their employer, are within the

zone protected by the Competition in Contracting Act.

### 10 U.S.C. § 4532—the "Arsenal Act"

 While the plaintiffs' interests in this case do not fall within the zones of interest arguably protected by either the procurement or competition provisions, they make a much stronger argument concerning the Arsenal Act. 10 U.S.C. § 4532. That provision states:

> (a) The Secretary of the Army shall have supplies needed for the Department of the Army made in factories or arsenals owned by the United States, so far as those factories or arsenals can make those supplies on an economical basis.

*Id.* Unlike the other statutes cited by the plaintiffs, which are aimed at facilitating and increasing the private provision of services and supplies, the Arsenal Act appears to be aimed at preserving the government's in-house military production capabilities. In holding that this was indeed the interest protected by the Arsenal Act, the district court relied on an interpretation provided by the General Counsel in a proceeding before the Comptroller General:

> In our view, the basic concept of [4532] was a requirement that government owned facilities should not be permitted to lie idle if it would be possible to use such facilities at a cost to the government no greater than the cost of procuring such needs from private industry.

*In Matter of Action Manufacturing Co.,* 85–2 Comp. Gen. Proc. Dec. 537 at 3 (1985). However, because the efficient use of government-owned facilities does not necessarily include the protection of government jobs, the district court concluded that the plaintiffs had failed to satisfy the zone-of-interest test.

While the district court's conclusion may have been correct when made, the Su-

preme Court's holding in *NCUA*, decided after the district court's decision and before oral argument in this court, has undermined it. *See* 522 U.S. 479, 118 S.Ct. 927, 140 L.Ed.2d 1. In that case, the court allowed an association of banks to sue the National Credit Union Administration to enforce the "common bond"[14] provision in credit union charters. *Id.* at 930. The Court concluded that there was an "unmistakable link" between the banks' competitive interest in confining the markets of credit unions and the purpose of the "common bond", which was to limit the size of credit unions. *Id.* at 935. Although it found no explicit congressional intent to benefit banks through the "common bond" requirement, the Court held that this link was enough to put the banks' interest within the zone protected by the statute at issue. *Id.* at 938. In doing so, it reemphasized that "we do not ask whether, in enacting the statutory provision at issue, Congress specifically intended to benefit the plaintiff." *Id.* at 935. Instead, the Court stated, the first task is "to discern the interests 'arguably ... to be protected' by the statutory provision at issue." *Id.*

Under this standard, the plaintiffs suggest that their employment interests are arguably contained within the Arsenal Act. The Act, explain the plaintiffs, was first passed just after the First World War in response to the frustration Congress had with wartime production at U.S. arsenals and factories. The overriding congressional purpose of the Act, the plaintiffs maintain, was to provide a ready industrial base in times of national emergency. That industrial base, they reason, necessarily included the continued employment of government workers trained and skilled in arsenal work. Support for this position is found in the floor debate which preceded the Act's initial passage. The plaintiffs cite two examples of what Congress considered the purposes of the Act:

**14.** See 12 U.S.C.§ 1757(5)-(6). This provision limited membership in every federal credit union to members of definable "groups". *NCUA,* 118 S.Ct. at 930.

The Assistant Secretary of War under the wide latitude given him can manufacture in small quantities all the latest designs in warfare. He can keep abreast of the times, so to speak, and have on hand a nucleus from which could be developed in a short time all the necessary modern implements of war .... Under this system also each arsenal will keep employed a considerable body of men who will become efficient in their work and a great Government asset if an emergency shall arise.

59 Cong. Rec. 4029 (March 8, 1920) (Remarks of Congressman Hull).

The arsenal is now equipped to do work of the finest grade involving that most intricate of all machine work necessary to produce modern cannon. There are about 2,500 men employed there at this time, a large part of whom the government plans to discharge in the near future.... The purpose of [the Act] is to compel the executive officers of the Government to have Government work done at such arsenals as this and to cease handing out appropriations to private manufacturers. It is perfect nonsense to allow such an investment to go to waste and at the same time turn over work to be done by contract by private manufacturers.

59 Cong. Rec. 4157 (March 10, 1920) (remarks of Congressman Sanford).

While this legislative history does not indicate an interest in preserving federal employment opportunities per se, the link between maintaining a ready workforce and preserving federal jobs is unmistakable. Just as the enforcement of the "common bond" requirement in NCUA necessarily advanced the competitive interests of banks, so the maintenance of a skilled arsenal workforce necessarily entails the preservation of federal employment opportunities. NCUA, 118 S.Ct. at 935. At the very least, we cannot say that the plaintiffs' interests are not at least "arguably" protected by the Arsenal Act. Id.

The government attempts to refute this conclusion in three ways. First, it argues that this case is identical to and controlled by Air Courier, a decision the Court specifically re-affirmed in NCUA. 118 S.Ct. at 938 (citing 498 U.S. 517, 111 S.Ct. 913). As explained above, in that case the Court held that federal postal workers were not within the zone-of-interests protected by the postal monopoly statute, even though its practical effect was to protect federal jobs. Air Courier, 498 U.S. at 529, 111 S.Ct. 913. Although there are undeniable similarities between the plaintiffs in the present case and the postal workers in Air Courier, that case is nonetheless distinguishable. The postal monopoly statute was designed to insure a sufficient amount of revenue on profitable mail routes in order to offset the cost, and insure the continued servicing, of remote and unprofitable routes. Id. The statute was a means of achieving "national integration and ensuring that all areas of the Nation were equally served by the Postal Service." Id. at 527, 111 S.Ct. 913. Having found no evidence to the contrary, the Court concluded: "Thus, the revenue protection provisions were not seen ... in any sense as a means of ensuring a certain level of public employment." Id. The legislative history of the Arsenal Act, on the other hand, arguably contains just such a concern: that U.S. arsenals have on hand a ready and skilled workforce in case of emergency. The government's reliance on Air Courier is thus misplaced.

■ Second, the government argues that, as with the procurement and contracting statutes, the employees' interest in enforcing the Arsenal Act is merely derivative of Rock Island's, and therefore not sufficient to support standing. See J.F. Shea Co. v. City of Chicago, 992 F.2d 745 (7th Cir.1993). But here the employees' interest in being part of an arguably protected arsenal workforce is direct and distinct from the Rock Island's interest in not sitting idle. See In Matter of Action Manufacturing, Co., 85–2 Comp. Gen.

Proc. Dec. 537 at 3 (1985). Therefore, for the purpose of challenging the Arsenal Act, our holding in *J.F. Shea* does not foreclose the plaintiffs' standing.

 Finally, the government claimed at oral argument that the Arsenal Act should not be considered a "relevant statute" in our zone-of-interest inquiry because its provisions do not apply to either of the work loads the plaintiffs mention. *See Clarke*, 479 U.S. at 401, 107 S.Ct. 750 (discussing "relevant statutes"). The Act's language, argued the government, deals only with "supplies" and, according to Army regulations, neither the M1A2 tank mounts produced by General Dynamics nor the VIPER program is defined as "supplies." Therefore, concluded the government, the Act's requirements do not apply to either project. Even if we were to consider an argument raised for the first time at oral argument, *see Matter of Chicago, Rock Island and Pacific R. Co.*, 865 F.2d 807, 815 (7th Cir.1988) (arguments raised for first time at oral argument are necessarily waived), we would nonetheless reject it. This a question on the merits of the case, and the government will have ample opportunity to present it. The plaintiffs have alleged a violation of the Arsenal Act. The only question before us is whether the interests they pursue are arguably within the Act's zone of protected interests. So long as the suit is not frivolous on its face, whether the Act ultimately provides relief is irrelevant at this stage. *LaSalle National Trust v. ECM Motor Co.*, 76 F.3d 140, 143 (7th Cir.1996) ("[I]t is obviously possible that a plaintiff may successfully invoke federal jurisdiction ... and yet may lose on some other ground, such as a failure to state a claim on which relief can be granted ... or failure to prove the merits after a full trial.").

We are satisfied that there exists an unmistakable link between the Act's provisions and the employees' interest such that it can reasonably be inferred that "Congress intended to permit the suit." *Clarke*, 479 U.S. at 400, 107 S.Ct. 750. We therefore hold that the plaintiffs have met the zone-of-interest test with respect to the Arsenal Act only.

## Conclusion

While we agree with the district court that the plaintiffs have failed to satisfy the prudential standing requirement to challenge violations of 10 U.S.C. § 2462 and 10 U.S.C. § 2304, they have met that requirement, as well as the constitutional standing requirements, with respect to the Arsenal Act, and may pursue their claim that it has been violated. For the reasons stated herein, we therefore AFFIRM in part, REVERSE in part and REMAND for further proceedings.