George MOORE; Jeff Gullatt; Kenneth Jackson; Vance Silvers; Daniel Burmeister; and International Association of Machinists & Aerospace Workers, Local Lodge 192, AFL–CIO, Plaintiffs,

v.

NAVY PUBLIC WORKS CENTER, Pensacola, Florida; and United States Navy, Defendants.

No. 3:01CV63RV.

United States District Court, N.D. Florida, Pensacola Division.

April 10, 2001.

---

Michael John Stebbins, Michael J. Stebbins PL, Pensacola, FL, Mary Jill Hanson, Hanson Perry & Jensen PA, West Palm Beach, FL, for George Moore, Jeff Gullatt, Kenneth Jackson, Vance Silvers, Daniel Burmeister, International Association of Machinists & Aerospace Workers Local Lodge 192 AFL–CIO, plaintiffs.

Anthony R. Crouse, U.S. Attorneys Office, Navy Litigation Office, Arlington, VA, Stephen P. Preisser, Michael P. Finney, U.S. Attorney, Northern District of Florida, Pensacola, FL, Henry D. Karp, Navy Litigation Office, Office of the Inspector General, Washington, DC, for Navy Public Works Center (Pensacola, FL, United States Navy, defendants.

## ORDER

VINSON, Chief Judge.

In this action, the plaintiffs, employees of the Navy Public Works Center at Pensacola ("NPWC") and the union that represents these employees, seek injunctive

and declaratory relief and a writ of mandamus against the defendants United States Navy and NPWC on the grounds that the defendants have continued to expend funds on a commercial activities study ("CA study") in violation of federal law and Department of Defense regulations. The plaintiffs assert their claims for declaratory and injunctive relief under the Administrative Procedure Act ("APA"), 5 U.S.C. § 702.[1] On February 27, 2001, an evidentiary hearing was held to address the plaintiffs' pending motion for a preliminary injunction (doc. 3). Upon consideration of all of the evidence and the arguments of both sides, I find that the plaintiffs' motion for a preliminary injunction must be denied.

## I. Background

This matter concerns whether the CA study has exceeded a 48–months time limitation. In Section 8024 of the current Department of Defense Appropriations Act (Pub.L. No. 106–259, 114 Stat. 656) the following provision is included:

> None of the funds appropriated by this Act shall be available to perform any cost study pursuant to the provisions of OMB Circular A–76 if the study being performed exceeds a period of 24 months after initiation of such study with respect to a single function activity or 48 months after initiation of such study for a multi-function activity.[2]

In this action, the parties dispute the date on which a CA study was "initiated" for purposes of this statute. The plaintiffs contend that the initiation date was the date on which the Navy notified Congress of its intent to conduct a CA study. The defendants take the position that the determinative date was the date on which a CA study team was formed and funds began to be expended in furtherance of the CA study.

On January 3, 1997, the then-Assistant Secretary of the Navy, Robert B. Pirie, Jr., notified Congress of the Navy's intent to embark on a study of whether certain commercial activities performed by military and civilian personnel of the Navy could be performed by private contractors more efficiently and more economically. This notification stated that the Navy would perform these CA studies under the procedures set forth in Office of Management and Budget ("OMB") Circular A–76. The purpose of Circular A–76 is to set forth the procedures for determining whether commercial activities should be performed under contract with commercial sources or in-house using Government facilities and personnel, known as most efficient organizations ("MEOs").[3] Among the commercial activities to be studied were certain functions of the NPWC, including those performed by the plaintiffs.

In January 1997, the Navy sent out a memorandum stating that the functions at NPWC, which were included in the Congressional notification, would undergo outsourcing competitions. At or about the

---

1. Title 5, United States Code, Section 702 states in pertinent part:
 A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof.

2. The CA study of NPWC involves a multi-function activity, so 48 months is the applicable time to be considered in this case.

3. Though this action is brought under the APA, Circular A–76 states that it shall not "[e]stablish and shall not be construed to create any substantive or procedural basis for anyone to challenge any agency action or inaction . . . ." Doc. 11, Ex. 2.

same time, the employees of NPWC were notified of the CA study process and were required to attend an "All Hands" meeting to receive information about the CA study. However, it appears that the Navy did not form a CA study team or begin spending funds on a CA study until April 1998. The plaintiffs contend that the 48–month clock began to run in January 1997 while the defendants take the position that it did not begin until April 1998.

Prior to commencing this action, the employees' Union filed a grievance with NPWC on January 19, 2001, in accordance with a collective bargaining agreement between NPWC and the Union. The grievance requested that NPWC cancel the ongoing A–76 study for the same reasons asserted in this action. On February 5, 2001, the Commanding Officer of NPWC denied the grievance, in part because the Navy had not exceeded the four-year period in which a CA study must be completed. The Union had the option of taking the grievance regarding whether the Navy's interpretation of the commencement date was correct to the next step in the arbitration procedure. Though the collective bargaining agreement requires that all disputes between the Union and the Navy be submitted to arbitration, the Union has elected to join the individual plaintiffs in bringing this court action to halt the CA study.

The plaintiffs contend that the period to complete the CA study for NPWC expired no later than January 3, 2001, 48 months after Congressional notification.[4] However, the defendants contend that the initi-

ation date is the date on which the study team was formed and that the Navy has until April 2002 to complete the CA study.[5] Therefore, the issue raised by this case is the interpretation of "initiation" as that term is used in section 8024 of the Department of Defense Appropriations Act of 2001.

## II. Preliminary Injunction

 "A district court may grant injunctive relief if the movant shows the following: (1) substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest." *McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1306 (11th Cir.1998); *see also E. Remy Martin & Co. v. Shaw–Ross Int'l Imports, Inc.*, 756 F.2d 1525, 1530 n. 13 (11th Cir.1985). Because a preliminary injunction is an extraordinary remedy, the movant must "establish[ ] the burden of persuasion as to the four requisites." *McDonald's Corp. v. Robertson, supra*, 147 F.3d at 1306. After reviewing all of the evidence in the record and considering the arguments of counsel, I conclude that the plaintiffs are not entitled to injunctive relief.

### 1. *Likelihood of Success on the Merits*

Several factors suggest that the plaintiffs will not be able to succeed on the merits of this case. Initially, the plain-

---

**4.** The plaintiffs cite a Status Update Report dated July 30, 1998, in which the CA/A–76 Study Manager for NPWC acknowledged that the CA study period began in January 1997 and that completion was required no later than January 2001. Doc. 4, Ex. A.

**5.** The defendants note that in September 1997, NPWC recorded four hours of in-house

labor to a job order number established to track CA study-related work. The Navy has been unable to confirm that any of this work was part of the cost study. Nevertheless, the defendants contend that even from this date, the 48 month period would not expire until September 2001.

tiffs are unlikely to satisfy two procedural requirements: standing and ripeness. Nevertheless, even if these procedural prerequisites are satisfied, I find that the plaintiffs have failed to demonstrate a substantial likelihood that the Navy's interpretation of the initiation date for a CA study is impermissible. For these reasons, a preliminary injunction is not warranted at this time.

### a. *Standing*

The initial obstacle facing the plaintiffs is that they rely upon a funding statute as the basis of their legal argument. On its face, the statute simply limits the use of the funds to a particular time period, and establishes no right of private enforcement. Thus, it appears that the plaintiffs do not have standing to bring this action. The plaintiffs seek relief for the Navy's alleged failure to comply with section 8024 of the Department of Defense Appropriations Act of 2001. The 48–months time period set forth in section 8024 is only applicable to the funding of a CA study, and the plaintiffs do not have an interest in the funding aspects of such studies. The only immediate injury claimed by the plaintiffs is anxiety about losing their jobs and problems related to this anxiety, such as high blood pressure and depression. However, such anxiety existed from the inception of the CA study, and the plaintiffs cannot claim that the extension of the CA study 'caused' this anxiety. Therefore, it does not appear that the plaintiffs can demonstrate standing to bring this action.

 Two standing requirements must be met to seek judicial review of administrative actions under the APA: (1) the constitutional requirement of an injury in fact; and (2) the prudential requirement of an interest falling within the zone-of-interests protected by the relevant statutes. *See Association of Data Processing Svc. Organizations v. Camp,* 397 U.S. 150, 153,

90 S.Ct. 827, 25 L.Ed.2d 184 (1970). The injury in fact requirement contains three components: first, the injury must be concrete, particularized, and actual or imminent [*see Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) ]; second, the injury must be traceable to the challenged conduct so as to bear a causal connection to the injury; [*id.*]; and third, a favorable decision by the court must be likely to redress the injury [*see id.* at 561, 112 S.Ct. 2130]. In addition to an injury in fact, the prudential requirement for standing requires a determination of whether the potential plaintiffs have established that the injury of which they complain "falls within the 'zone-of-interests' sought to be protected by the statutory provision whose violation forms the legal basis for [the] complaint." *American Fed'n of Gov't Employees, Local 2119 v. Cohen,* 171 F.3d 460, 468 (7th Cir.1999) (citing *Lujan, supra,* 497 U.S. at 883, 110 S.Ct. 3177). The Supreme Court has explained:

> In cases where the plaintiff is not ... the subject of the contested regulatory action, the test denies a right of review if the plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit. The test is not meant to be particularly demanding; in particular, there need be no indication of congressional purpose to benefit the would-be plaintiff.

*Clarke v. Securities Indus. Ass'n,* 479 U.S. 388, 399–400, 107 S.Ct. 750, 93 L.Ed.2d 757 (1987). A plaintiff will satisfy the zone-of-interests test when there is "an 'unmistakable link' between a statute's purpose and the interest advanced by the plaintiff .... [and][w]hen such a link exists, it can safely be inferred that those interests are within the zone protected by the statute." *See American Fed'n of Gov't Employees, supra,* 171 F.3d at 469 (citing *National Cred-*

*it Union Admin. v. First Nat'l Bank & Trust*, 522 U.S. 479, 118 S.Ct. 927, 936 n. 7, 140 L.Ed.2d 1 (1998)).[6]

■ The plaintiffs are unlikely to satisfy these standing requirements. There has been no injury in fact. First, the loss of federal employment has not occurred. Therefore, any injury arising from the loss of employment is not actual or concrete. Moreover, it is not particularized or imminent because the extent and nature of such an injury cannot be ascertained until the CA study is completed, administrative appeals are taken, and a reduction-in-force ("RIF") is instituted. Second, there has been no causal connection shown between the challenged conduct and a protected ascertainable injury. Third, the relief sought may not redress the alleged injuries because an injunction halting the CA study does not solve the underlying budgetary concerns of the Navy and Congress. Therefore, even if an injunction is ordered, an RIF may still be necessary. For these reasons, it will be difficult for the plaintiffs to demonstrate an injury in fact sufficient to establish standing. *See American Fed'n of Gov't Employees v. Clinton*, 180 F.3d 727, 731 (6th Cir.1999) (finding that loss or possible loss of federal jobs or harm to employment prospects too speculative to establish Article III standing).

■ Perhaps more importantly, it appears that the employees' interests do not fall within the zone of interests that Congress sought to protect when it enacted section 8024. The legislative history for this provision in prior appropriations acts suggests that Congress' primary intent in enacting the 48–months time period was to limit the financial costs of unnecessarily lengthy CA studies. *See* Doc. 11, Exs. 6, 7. Moreover, the Act does not establish a private cause of action. Section 8024 merely operates to cut-off funding for a CA study after it has been ongoing for longer than 48 months. There is no indication that Congress intended to protect any interests of federal employees when it enacted the 48–months limit on funding. *See American Fed'n of Gov't Employees, Local 2119 v. Cohen*, 171 F.3d 460, 470–72 (7th Cir.1999) (finding that "federal employees' general interest in proper procedures does not distinguish them from the public at large, and it is not sufficient by itself to satisfy the zone test"); *National Fed'n of Fed. Employees v. Cheney*, 883 F.2d 1038, 1049 (D.C.Cir.1989) (finding that Congress' intent in contracting out services is to improve governmental efficiency and to reduce the costs of services currently performed by government employees and that interests of current federal employees are inconsistent with this purpose), *cert. denied*, 496 U.S. 936, 110 S.Ct. 3214, 110 L.Ed.2d 662 (1990). The plaintiffs rely upon *National Weather Svc. Employees Org. v. Brown*, 18 F.3d 986, 988–89 (2d Cir.1994) (finding that interests of federal employees were within zone of interests of Weather Service Modernization Act because statute required Union representation on Modernization Committee),[7] and *American Fed'n of Gov't Em-*

---

**6.** The standing of the Union will depend upon the standing of its members.

> [A]n association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the suit.
>
> *Hunt v. Washington St. Apple Advertising Comm'n*, 432 U.S. 333, 343, 97 S.Ct. 2434, 2441, 53 L.Ed.2d 383 (1977). Therefore, the Union has standing if the individual plaintiffs, who are members of the Union, have standing.

**7.** In *National Weather Service Employees Organization. v. Brown*, the Court of Appeals for

*ployees v. United States,* 104 F.Supp.2d 58, 63 (D.D.C.2000),[8] but I conclude that neither of these cases is factually analogous.

The plaintiffs claim that they have standing because section 2461(b)(3)(B) of the Department of Defense Appropriations Act of 2001 requires a CA study to consider the economic impact of outsourcing on the effected employees. However, that provision concerns how a CA study is conducted, and not the manner in which it is funded. The plaintiffs have sought relief based on the 48–months limit on funding for CA studies, not the manner in which a CA study is conducted. There is no indication that this 48–months limit was intended for any purpose other than to hold down the costs of unnecessarily long CA studies. Therefore, the plaintiffs, as employees of NPWC, do not appear to have any special interest protected or served by the 48–months funding limit.

b. *Ripeness*

 It also appears that this case is not yet ripe for adjudication. The ripe-

ness doctrine embodies the prudential considerations that may counsel judicial restraint, even when the minimal constitutional requirements for Article III standing have been met. *See Digital Properties, Inc. v. City of Plantation,* 121 F.3d 586, 589 (11th Cir.1997). "The ripeness inquiry requires a determination of (1) the fitness of the issues for judicial decision, and (2) the hardship to the parties of withholding court consideration." *Id.* Currently, there is no binding and conclusive administrative decision to be reviewed. An appeal is apparently pending before the Navy, and this dispute may still be submitted to arbitration, as required by the collective bargaining agreement between the plaintiff-Union and NPWC. Moreover, if it is ultimately determined that an RIF is necessary, it is unclear which of the plaintiffs, if any, will be affected by such action. To date, the CA study has not caused any employee of NPWC to lose his or her job. For these reasons, it will probably be necessary to permit the administrative review process

the Second Circuit found that a federal employees union had standing to seek an injunction against the National Weather Service for failure to comply with the dictates of the Weather Services Modernization Act of 1992. *See Brown, supra,* 18 F.3d at 987. The Second Circuit found that the Union representing the employees fell within the zone of interests of the statute because "[t]he Modernization Act was enacted with union and worker interest at least partly in mind. It specifically provides that members of the Modernization Transition Committee established under the Act are to come from various interested groups, including 'any labor organization' ...." *Id.* at 989. However, *Brown* is distinguishable from this case because the statute in *Brown* concerned the methods for conducting the modernization of the National Weather Service. Here, the plaintiffs are not contesting the manner in which the defendants have conducted the CA study. Instead, they are contesting the amount of money spent on the CA study on the grounds that it is inconsistent with the "funding" statute. Though

the plaintiffs may have an interest in how the CA study is conducted, they do not appear to have an interest in the funding of such studies.

8. In *American Federation of Government Employees v. United States,* the District Court held that federal civilian employees had standing to challenge the government's decision, pursuant to a preference in the Department of Defense Appropriations Act of 2000, to give work to a Native American firm without conducting a CA study. In that case, the federal employees had standing because the *failure* to conduct a CA study would result in the loss of their jobs without just cause, which would be a violation of the employees' rights to constitutional due process. *See id.* at 69–70. Here, plaintiffs contend that they have alleged the same injury. However, the 48–months time limit at issue in this case is limited to the funding of a CA study, and the plaintiffs have failed to demonstrate how this funding limit affects their constitutional rights to due process.

to fully run its course and to defer any litigation until more concrete actions have been taken by the defendants.

### c. *Beginning Date for a CA Study*

██ The underling issue in this case is the correct interpretation of the word "initiation" as it is used in section 8024 of the Department of Defense Appropriations Act of 2001. The initiation date for the CA study appears to be a flexible date, and the Navy is entitled to some deference in its interpretation of that date. In reviewing an agency's interpretation of a federal statute, a district court must engage in a two-step inquiry. First, the court must decide whether Congress has spoken to the disputed issue directly. If Congress has directly spoken, then the statutory term is unambiguous and the court must give effect to the expressed intent of Congress. *See Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 843, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984). However, when the statute is silent or ambiguous, the court must determine whether the interpretation of the statute provided by the agency is a permissible one. *See id.* at 843, 104 S.Ct. at 2782. It appears that the Department of Defense Appropriations Act at issue does not clearly define the term "initiation" as it is used in section 8024. Therefore, the ultimate issue to be determined is whether the Navy's interpretation is permissible.

Plaintiffs rely on Title 32, Code of Federal Regulations, Section 169a.15(d)(1)(i), which states:

(i) Congressional notification. DoD Components shall notify Congress of the intention to do a cost comparison involving 46 or more DoD civilian personnel. DoD Components shall annotate the notification when a cost comparison is planned at an activity listed in the report to Congress on core logistics (see section 169a.9(a)(1)(ii)). The DoD Component shall notify the ADS (P & L) of any such intent at least 5 working days before the Congressional notification. *The cost comparison process begins on the date of Congressional notification.* 32 C.F.R. § 169a.15(1)(i) (emphasis added). This regulation is a codification of Department of Defense Instruction 4100.33.[9] Doc. 11, Exs. 8, 9. Moreover, with respect to this same provision in the Department of Defense Appropriations Act of 1991, the House Committee on Appropriations set out that "[a] study is considered begun when the Department notifies the Committees on Appropriations of the House and Senate of a proposed A–76 Study." Doc. 11, Ex. 7.

However, the OMB's Circular A–76 Revised Supplemental Handbook (March 1996), which seems to be the controlling document for the A–76 studies, notes that the term "start date" is used in two ways:

First, it is the date when a cost comparison begins, generally defined as the date that a local Study Team is formed and actual work on the Performance Work Statement, Management Plan and in-house cost estimate begins. Second, it may refer to the actual date work is scheduled to begin under a contract, as provided in the solicitation.

Doc. 11, Ex. 3 (emphasis added). The Navy has adopted the OMB's first definition of "start date" as the date on which the 48–months period commences.[10] De-

---

**9.** This instruction states that it shall not "establish and shall not be construed to create any substantive or procedural basis for anyone to challenge any DoD action or inaction . . . ." Doc. 11, Ex. 8 at 2.11.

**10.** According to the defendants, this guidance from the OMB is more reliable than the Department of Defense Instruction cited by the plaintiffs because in Executive Order 12,615, 52 Fed.Reg. 44853 (Nov. 19, 1987), the President of the United States instructed the Di-

fendants also cite OPNAV Program Advisory 00–04 (Feb. 4, 2000), which was issued to clarify existing Navy policy regarding the CA study start date. This Advisory recognized that the comparison start date was the day of public or union notification and designation of the study team. Specifically, the Advisory stated:

Few study teams are identified at the time of announcement to Congress. Since the formation of the study teams are unknown at announcement, it will be the policy to continue to use the announcement date until the activity, through their chain of command, come in with a more accurate start date, i.e., public or union notification and designation of the study team. This date will be entered into the CAMIS comment section and will serve as the official start date for the purposes of computing the 24 and 48–month windows.

Doc. 11, Ex. 4.

■ It appears that the Navy's notification to Congress in January 1997 included virtually all functions that could conceivably be subject to a CA study, but no study team was formed to conduct the NPWC study nor were substantive funds expended on the NPWC study until April 1998. In reviewing the Navy's interpretation of this statute, I must determine whether the Navy has adopted a permissible interpretation. The "initiation" date as used in the Act seems to be the same as a start date, and OMB has set out definitionally an interpretation which the Navy has adopted. There is no indication that OMB disagrees. Moreover, because the 48–months period relates to the funding of such studies, the Navy's interpretation that the 48–months period begins from the formation of a study team appears to be permissible. For these reasons, I find that the plaintiffs have failed to demonstrate a substantial likelihood that the Navy's interpretation of "initiation," as used in section 8024, was impermissible. Therefore, a preliminary injunction is not warranted.

*2. Other Factors for Preliminary Injunction*

In light of my finding that the plaintiffs have failed to demonstrate a substantial likelihood of success on the merits, it is not necessary to examine the other factors for a preliminary injunction.

**III. Conclusion**

For the above reasons, the plaintiffs' motion for a preliminary injunction (doc. 3) is DENIED.

---

rector of the Office of Management and Budget to issue guidance to departments and agencies in implementing CA studies. Doc. 11, Ex. 1.